COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-021-CR

 

 

BRANDON LYNN HAMPTON                                                  APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

 

I.  Introduction








Appellant
Brandon Lynn Hampton appeals his conviction for the murder of his
seventeen-month-old son, Jody.  Jody was
injured while in Hampton=s care when Jody=s mother
was at work.  Jody died of his injuries
two days later.  In four points, Hampton
argues that the trial court erred by denying his request that a lesser included
charge of deadly conduct be included in the jury charge, that the evidence is
legally and factually insufficient, and that the trial court erred by admitting
the testimony of two experts.  After this
case was submitted, Hampton filed a motion to withdraw his first and fourth
points.  We granted the motion and
therefore will address only his second and third points dealing with the
sufficiency of the evidence.  We will
affirm.

II.  Factual Background[2]

A.  Before AThe Fall@

Hampton,
Jody, and Jody=s mother Melissa Mena lived
together at the Rosemeade Apartments. 
Brian Adkins lived in a nearby apartment on the same floor.  Adkins testified that on the morning of May
25, 2007, his apartment door was open, and he heard yelling followed by two
back-to-back thuds.  He said that the two
thuds came from the second floor and sounded like something hitting the wall or
the floor twice; the noise did not sound like a child falling down stairs.  Adkins walked to his apartment door and did
not see anything outside.  He said that
if Jody had fallen down the stairs, he would have seen Jody because from his
doorway, he had Ano choice but to see the
stairwell.@ 

 








B.  AThe Fall@

Hampton
told the police that after Melissa left for work on the morning of May 25, he
decided to take Jody to McDonald=s for
breakfast.  He said that he was holding
Jody=s hand
when they exited the apartment but said that he had to let go of Jody=s hand
to lock the door.  As he was locking the
door, he heard Aplunk, plunk@ and saw
Jody on the stairs.  He could not
remember if it was two, three, or four steps that Jody fell down. 

Melissa
testified that Jody was fine when she left him with Hampton on May 25 and went
to work.  After she arrived at work, she
received a call from Hampton, saying that Jody was not breathing.  She rushed home, and when she arrived about
ten minutes later, Jody was not conscious, his eyes were closed, and his body
was stiff.  Hampton told her that Jody
had fallen down the stairs.  Melissa told
Hampton to breathe into Jody=s mouth
while she called 911. 

C. 
Testimony from Those at the Apartment Complex








Fady
Abdo, Hampton=s neighbor, testified that on
the day in question, he saw Hampton come running out of his apartment, crying
out for help.  Hampton and Melissa asked
Abdo to perform CPR on their baby, but Abdo told them that the baby needed a
doctor because he was breathing but his eyes were not responding.  Hampton was nervous and angry that the
ambulance did not arrive immediately. 
Hampton told Abdo that Jody had fallen down the stairs and said, AI=m in
trouble.@ 

Michael
Bender, who was in charge of the maintenance at the Rosemeade Apartments,
testified that he saw an emergency squad in front of Hampton=s
apartment building on the day in question. 
He heard a neighbor crying, AThat
baby, that baby, that poor baby is hurt.@  Bender saw Hampton come out of his apartment
and walk down the stairs, and Bender heard Hampton scream, AShit,
shit,@ as he
clenched his fists and exhibited a mad facial expression. 

Donna
Jones, who lived in the apartment across from Hampton and used to babysit Jody,
remembered the ambulance coming on May 25 and hearing Hampton tell the
paramedics, AHurry up, he=s not
breathing.@ 
She saw Jody in the middle of the floor with his eyes and mouth half
open; his chest was up like he was taking a deep breath, but his stomach was
flat.  The paramedics asked her, Hampton,
and Melissa to leave, and Hampton stood over Melissa Abeating
like this@[3] and
saying, AYou is
the one who caused this; you is the one who caused this.@  Jones said that the paramedics left with Jody
on a stretcher. 

 

 








D.  The
Paramedics= Observations








William
Bostwick, a firefighter and paramedic with the City of Dallas Fire/Rescue
Department, testified that he arrived at the Rosemeade Apartments on May 25
after receiving a call about an unconscious person.  He said that Hampton was hollering from the
second-floor balcony that the patient had stopped breathing and was yelling, ASave my
son, save my son.@ 
Hampton scooped up Jody from the couch and brought him to the
paramedics, frantically asking them to hurry and get Jody to the hospital.  Bostwick took Jody and laid him on the living
room floor.  Hampton said that Jody had
fallen down a flight of concrete stairs. 
Bostwick looked through Jody=s scalp
and did not see any abrasions but noted that he was unconscious and thought
that Jody=s injuries must have been caused
by trauma.  Before placing a cervical
collar on Jody=s neck, Bostwick noticed that
there was a scratch on the left side of Jody=s neck
that was consistent with a fingernail scratch. 
He could not say how the scratch occurred, nor could he say that Jody=s
injuries were not the result of an accident; the Dallas Fire Department
described the injuries as unintentional.         Spencer
Smith, a flight paramedic with Care Flite, testified that he took Jody to
Children=s
Medical Center in Dallas via helicopter. 
He noted that Jody=s airways were partially
obstructed, that he had a decreased level of consciousness, and that he was Aposturing,@ which
was an indication of a head injury. 

E.  At the
Hospital

Dr.
Matthew Cox, who is an assistant professor of pediatrics at UT Southwestern
Medical School and is the medical director of the child abuse evaluation team
at Children=s Medical Center, testified that
he has been doing child abuse evaluations for six and a half years and sees 250B300
cases a year. When Jody presented to the emergency department at Children=s
Medical Center on May 25, Dr. Cox was contacted to help with the evaluation due
to the severity of Jody=s head injury.[4]  Jody presented with a severe,
life-threatening head injury and associated retinal hemorrhages, and the
initial history of falling down the stairs was not of a severity to adequately
explain the extent of his injuries.  








When Dr.
Cox went to the emergency room, he saw that Jody was on life support, that he
was not responsive, and that he was being prepped for brain surgery.  He quickly looked at Jody and noted that he
had an abrasion and some surrounding bruising on the left side of his forehead,
that he had a red abrasion on the side of his neck,[5]
and that there was not any significant swelling or injury to the scalp
tissue.  Dr. Cox also saw that Jody had a
patterned scar on his left buttock, a loop mark on his Aleft
butt cheek,@ some linear scars on his other Abutt
cheek,@ and
straight line scars on the outer part of his left leg.  Jody had no broken bones and no signs of
abdominal injuries. 

Dr. Cox
then went to the emergency room=s
waiting room to attempt to get a history from Jody=s
parents.  When Dr. Cox asked Jody=s
parents for a history, they told him Ano@ and
that they had already talked to the doctors and were not going to talk to
anyone else.  This concerned Dr. Cox
because no family had ever refused to provide information, and he believes that
parents are the best source of information. 
While Dr. Cox attempted to question Hampton, he was angry and yelling,
and a security guard was called to calm him down. Ultimately, Hampton said that
Jody had fallen down four or five stairs and that he was limp when he picked
him up.  Hampton said that he called Jody=s mother
and that they called 911 after she returned home from work. 








Dr. Cox
testified that Hampton=s explanationCthat
Jody fell down several stairsCwas not
consistent with Jody=s injuries.  Dr. Cox said that stairway falls typically
cause bumps and bruises and that concrete steps usually cause skin injuries.  Dr. Cox stated that children have a tendency
to fall head down because their heads are disproportionately larger than the
rest of their bodies. Consequently, a child falling down stairs usually endures
a series of falls and has minor, superficial, nonfatal injuries, like a bump on
the head.  

But
here, Jody had no skin injuries on his head other than a superficial abrasion
on the left of his forehead[6]
and one along the side of his neck, a location that Dr. Cox noted would be
unusual for a fall down stairs, and yet Jody=s CT
scan showed bleeding around Jody=s brain
and brain swelling.  Dr. Cox explained
that the subdural hemorrhage and hematoma (i.e., blood that was collecting) on
the right side of Jody=s brain was exerting pressure on
the brain and causing a midline shift of the brain structures.  Dr. Cox explained that typically, subdural
hemorrhages are indicators of a traumatic event, as are retinal hemorrhages.  Dr. Cox testified that Jody underwent a
craniotomy to drain the blood that was exerting pressure on his brain. 








Dr. Cox
opined that Jody=s injuries were the result of
severe traumatic forces because Jody=s height
and weight would not have generated enough force to cause this kind of injury
by falling down four or five steps. 
Based on Dr. Cox=s training and experience, he
opined that some object had to strike Jody in the head or that he struck some
object with his head in order to cause his injuries or that shaking could have
caused his injuries.[7]  He did not think it was an accident because
of the severity of Jody=s injuries.  Instead, he said that there was no indication
of anything other than trauma causing the hemorrhage. 








During
cross-examination, Dr. Cox agreed that short falls can produce intracranial
hemorrhaging but that he does not see that very often.[8]  Dr. Cox agreed that if Jody had recently
injured his neck from the fall on the stairs, he could have, if the fall was
severe enough, suffered bleeding from arteries and veins in the lower portion
of his neck.  Dr. Cox did not agree,
however, that if there had been bleeding in Jody=s neck
that no one noticed that it could account for some of the hemorrhaging that was
attributed to the front right of his brain. 
Dr. Cox said that no other area of hemorrhaging was noted other than
that seen in the CT scan on the right top side of the brain.  Moreover, there were no medical findings to
suggest that Jody had any preexisting conditions; Jody=s
pediatrician told Dr. Cox that Jody had been otherwise healthy and had normal
development.  And because Jody was
walking and acting normally earlier that day, Dr. Cox testified that it was
highly unlikely that Jody had brain swelling before May 25.  Instead, Dr. Cox stated that based on the
symptoms Jody presented with, he had a new head injury, and Dr. Cox=s best
medical evaluation was that Jody=s injury
occurred right before he developed neurological symptoms when he was found
limp. 

Dr. Cox
testified that Jody ultimately died on May 27, two days after he was admitted to
the hospital.  When asked to explain what
caused Jody=s death, Dr. Cox testified that
Jody was brain dead; he did not have signs of neurologic function as a result
of a brain tissue injury that led to a fatal intracranial injury.  

F.  Autopsy
Findings








Dr.
Reade Quinton of the Dallas County Medical Examiner=s Office
performed the autopsy on Jody.[9]  He noted no evidence of bruising on Jody=s back,
legs, or arms but found a few small scars on the right and left buttocks that
were consistent with trauma and a small linear red abrasion on the left side of
Jody=s
neck.  There were dark areas evidencing
trauma to the scalp, but Dr. Quinton said that some of that was caused by the
craniotomy. 

Dr.
Quinton said that the eyes are removed in autopsies, particularly when children
have suffered head injuries, because it may show a manifestation of
trauma.  He explained that retinal
hemorrhaging shows trauma because it reveals an increase in pressure in the
head.  Here, when Dr. Quinton removed
Jody=s eyes,
he saw a number of small, dot-like retinal hemorrhages that were distributed
over the retinas in both eyes.  Dr.
Quinton stated that there was increased pressure in Jody=s brain
because there was a large subdural hematoma taking up space in his skull; Dr.
Quinton said that when there is an injury to the brain that causes it to swell,
there is no place for it to go but down to the base of the brain stem, where it
can shut down the respiratory system and ultimately cause death. 








Dr.
Quinton stated that his autopsy findings all fall under the heading of Ablunt
force injury of the head@:  there was diffuse soft tissue hemorrhage of
the right side of the scalp (i.e., bleeding under the scalp); patchy subdural
hemorrhage on both the right and left sides, but greater on the right side;
patchy subarachnoid hemorrhage, which is basically an additional hemorrhage
right over the surface of the brain itself; the optic nerve sheath hemorrhage;
retinal hemorrhages; prominent cerebral edema (i.e., swelling of the brain);
evidence of surgical intervention (i.e., craniotomy); and scattered small
abrasions on the left side of the face and neck.  He noted nothing significant during the
internal exam of Jody=s organ systems and no previous
skull fractures.  Instead, he said that
Jody=s severe
head trauma was an acute injury that had not had time to heal. 

Dr.
Quinton could not tell the jury what force was used but disagreed with Dr. Cox
that a seventeen-month-old child could be exclusively shaken to death without
some type of impact as well; Dr. Quinton opined that this was not a shaking
case.  He clarified that he could not say
that there was not some shaking, but he did not care about that because this
case involved an impact. Dr. Quinton also disagreed with Dr. Plunkett=s
stance, as set forth in a study paper introduced by the defense, that short
falls can kill children.








To
determine the cause and manner of Jody=s death,
Dr. Quinton spoke to the police and reviewed the crime scene investigation.[10]  He said that the findings did not match the
story that the child had fallen down four or five stairs because the force of
falling down a few stairs would not generate this type of subdural traumatic
brain injury.  After a fall, he would
have expected to see outward injuries to the scalp, but none were
documented.  Dr. Quinton therefore concluded
that Jody=s death was related to blunt
force injuries to Jody=s head and that the manner of
his death was homicide. 

G. 
Findings of Investigation

Gary O=Pry, who
was formerly with the Dallas Police Department=s crime
scene unit, testified that he went to the Rosemeade Apartments on May 26, 2007
to look for evidence and to photograph the scene.  He found a child=s shirt
that had blood on it and noted that the neck of the shirt was torn, and he took
pictures of the bedroom, showing two indentations of fist prints in the wall
over the bed.  He said that there were no
signs of a fall on the stairs and that the only blood that was found was on the
child=s shirt.


Katherine
Zimmer, a crime scene detective with the Dallas Police Department, testified
that she took photographs of and fingernail clippings from Hampton on the
evening of the incident.  Another crime
scene investigator, Jeffrey Coats, read the DNA test results from Hampton=s
fingernail clippings into evidence:

Based on the analysis, the DNA
obtained from Sample 3T1, swabbing of fingernails, right hand, of Brandon
Hampton, is at least 136 million times more likely that Brandon Hampton and
Jody Hampton were the sources of the DNA obtained from Sample 3T1, which is the
fingernails of the right hand of Brandon Hampton . . . than if Brandon Hampton
and an unknown individual were the source of the DNA obtained from 3T1,
swabbing of right fingernails -- or swabbing of fingernails from right hand of
Brandon Hampton. 








Coats testified that Ayou=d have
to grab somebody pretty hard to get skin cells underneath [your fingernails].@ 

H.  Result
of Investigation

Sabra
Garibay, a child abuse investigator with the Dallas Police Department,
testified that during her interview of Hampton at the hospital, he was
aggravated that he had to tell his story to her.  Garibay asked Hampton how Jody had received
his injuries and found it peculiar that Hampton described Asnot@ going
everywhere because he did not mention Jody crying.  Garibay said that Hampton=s
explanation for Jody=s injuries raised red flags

because Hampton talked about
blood around Jody, but Jody had no cuts. 
Garibay also found it odd that Hampton did not call 911 before he called
Melissa, even though Hampton said that Jody was gasping for breath.  Hampton told Garibay during the interview
that he did not want to stay and asked if he could leave; she told him he
could, and he asked, ASo I can just get up and walk
out the door?@ 

After
his interview, Hampton yelled at Melissa, telling her that she did not have to
say anything, that she should not write anything, and that she did not have to
talk to Garibay.  Garibay observed that
after Hampton=s outburst, Melissa acted very
intimidated and did not want to talk to her. 









Garibay
spoke with Dr. Cox and became increasingly concerned because Jody=s
medical history did not match up with the history of events given by
Hampton.  After speaking with Dr. Cox[11]
and knowing that Hampton was Jody=s sole
caretaker when he was injured, Garibay arrested Hampton.  The factors that Garibay took into account
before making the decision to arrest Hampton included Jody=s
medical history, the sequence of the injury as explained by Hampton and its
inconsistency with Jody=s injuries, the fact that
Hampton was alone with Jody when the injury occurred, and the fact that Jody
was fine when Melissa left for work that morning.  Garibay testified that she is confident
beyond a reasonable doubt that Jody=s
injuries were not the result of an accident. 

I.  Result
of Trial

After
hearing the above evidence, the jury found Hampton guilty of murder as alleged
in the indictment and assessed his punishment at twenty-five years=
confinement.  The trial court imposed the
sentence assessed by the jury, and this appeal followed.

 

 








III.  Standards of Review

A.  Legal
Sufficiency

In
reviewing the legal sufficiency of the evidence to support a conviction, we
view all of the evidence in the light most favorable to the prosecution in
order to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007). 








This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. 
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235
S.W.3d at 778.  The trier of fact is the
sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State,
270 S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct.
2075 (2009).  Thus, when performing a
legal sufficiency review, we may not re-evaluate the weight and credibility of
the evidence and substitute our judgment for that of the factfinder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.

B.  Factual
Sufficiency

When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party.  Steadman v. State, 280 S.W.3d 242, 246
(Tex. Crim. App. 2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006).  We then ask whether the
evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Steadman, 280 S.W.3d at
246; Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great weight
and preponderance of all the evidence, although legally sufficient, contradicts
the verdict.  Watson, 204 S.W.3d
at 417.  








Unless
we conclude that it is necessary to correct manifest injustice, we must give
due deference to the factfinder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Johnson v. State, 23 S.W.3d 1, 9 (Tex.
Crim. App. 2000); see Steadman, 280 S.W.3d at 246.  Evidence is always factually sufficient when
it preponderates in favor of the conviction. 
Steadman, 280 S.W.3d at 247; see Watson, 204 S.W.3d at
417.  








In
determining whether the evidence is factually insufficient to support a
conviction that is nevertheless supported by legally sufficient evidence, it is
not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Watson, 204 S.W.3d at 417.   We cannot conclude that a conviction is
clearly wrong or manifestly unjust simply because we would have decided
differently than the jury or because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the factfinder=s.  Johnson, 23 S.W.3d at 12; Cain v.
State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Our deference in this regard safeguards the
defendant=s right to a trial by jury.  Lancon v. State, 253 S.W.3d 699, 704
(Tex. Crim. App. 2008).  An opinion
addressing factual sufficiency must include a discussion of the most important
and relevant evidence that supports the appellant=s
complaint on appeal.  Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

IV.  Sufficient Evidence to Support Conviction

In his
second and third points, Hampton argues that the evidence is legally and
factually insufficient to support his conviction.  Specifically, Hampton challenges the
sufficiency of the evidence to show (1) that shaking caused Jody=s death,
(2) that Hampton struck Jody=s head
or caused it to strike an unknown object, and (3) that Hampton administered a
blow that had sufficient force to cause Jody=s death.


A.  Law on
Murder

A person
commits murder if he intentionally or knowingly causes the death of an
individual or intends to cause serious bodily injury and commits an act clearly
dangerous to human life that causes the death of an individual.  Tex. Penal Code Ann. ' 19.02(b)(1)B(2)
(Vernon 2003).

 

 








B.  Legally
Sufficient Evidence

Hampton
combines his legal and factual sufficiency claims, which are based almost
entirely on whether the State established Alegal
causation.@ Viewing the evidence in the
light most favorable to the verdict, the record demonstrates that Hampton was
the sole person who was present when Jody started having trouble
breathing.  On the morning in question,
one of Hampton=s neighbors heard yelling
followed by two back-to-back thuds that sounded like something hitting the wall
or the floor twice and did not see anything outside in the stairwell.  Photographs of Hampton=s
bedroom revealed two fist-sized indentations in the wall.  Photographs also showed that Jody=s neck
had a scratch on it, and DNA test results of the fingernail swabbing taken from
Hampton revealed that it was at least 136 million times more likely that he and
Jody were the sources of the DNA that was tested than any other two people were
the sources of the DNA.  Jody=s shirt
had a tear in the neck and had blood on it; however, no blood was found on the
stairs.  








Both Dr.
Cox and Dr. Quinton testified that the version of events recited by Hampton
about Jody=s falling down four or five
stairs was not consistent with the severe, fatal injuries that Jody sustained,
and both doctors testified that a fall down four or five stairs could not have
caused Jody=s injuries.  Based on Dr. Cox=s
training and experience, he opined that Jody=s
injuries were not an accident; instead, he said that some object had to strike
Jody in the head or he had to strike some object with his head in order to
cause his injuries or that shaking could have caused his injuries.  Dr. Quinton also concluded that Jody=s death
was not an accident and instead ruled that the manner of his death was
homicide. 

The
record also reflects that Hampton failed to call 911 before calling Melissa,
became hostile at the hospital when he was asked to tell his story to Dr. Cox,
told Melissa not to talk to anyone at the hospital, and made incriminating
statements to people at the apartment complex, including a statement that he
was Ain
trouble.@ 








After
viewing all of the evidence in the light most favorable to the jury=s
verdict, we hold that a rational trier of fact could have found beyond a
reasonable doubt that Hampton committed an act clearly dangerous to human life
by shaking Jody, by causing Jody to strike an unknown object, or by striking
Jody with an unknown object, which caused his death.[12]  See Jackson, 443 U.S. at 319,
99 S. Ct. at 2789; Brown, 270 S.W.3d at 568; Clayton, 235 S.W.3d
at 778; Kelley v. State, 187 S.W.3d 761, 763B64 (Tex.
App.CHouston
[14th Dist.] 2006, pet. ref=d)
(holding evidence legally sufficient to support injury to a child conviction
when every expert testified that baby=s
injuries could not have been caused by an accident on changing table as
described by appellant); Tejeda v. State, No. 13-95-00394-CR, 1997 WL
33641979, at *4 (Tex. App.CCorpus
Christi Apr. 10, 1997, no pet.) (not designated for publication) (holding
evidence legally sufficient to support conviction for murder of
twenty-nine-day-old infant when expert testimony discounted appellant=s stories
and established that infant died from hemorrhaging around brain that could have
resulted from sudden impact with hard object or from vigorous shaking).  Accordingly, we hold that the evidence is
legally sufficient to support Hampton=s
conviction, and we overrule his second point.








C. 
Factually Sufficient Evidence

Hampton
also argues that the evidence is factually insufficient to show Alegal
causation@ because there was conflicting
evidence by the experts regarding shaking, there was no direct proof of
striking, and the experts could not specify an exact force.

The
record reveals that the expert testimony was not conflicting; Dr. Cox included
shaking as one of the ways that Jody=s
injuries could have been caused, and Dr. Quinton did not rule out shaking
completely but instead stated that Jody=s injuries
could not have been caused solely by shaking and that he was more focused on
the fact that there was an impact to Jody=s
head.  

As set
forth above, the jury was not required to find that Hampton caused Jody=s death
by both shaking and striking, but the record also contains factually sufficient
evidence of striking.

The
State presented circumstantial evidence of striking:  a neighbor testified that he heard thuds,
photographs showed indentations in Hampton=s
bedroom wall, and Hampton was alone with Jody when he suffered fatal head
injuries.  Although no one testified that
Hampton struck Jody, there was no other explanation given for Jody=s fatal
head injuries after initial reports of an Aunintentional@
accident were ruled out following the crime scene investigation.








With
regard to the force used, Dr. Cox and Dr. Quinton could not specify the exact
force necessary to cause Jody=s
injuries but said that it was more traumatic or severe than falling down four
or five stairs.  Garibay said that
Hampton gave the stairs as the only explanation for Jody=s
injuries, but the jury was free to disbelieve him. 








We have
reviewed the evidence in a neutral light, and we find no objective basis in the
record for holding that the jury=s
verdict was clearly wrong or manifestly unjust or that it was contradicted by
the great weight and preponderance of the evidence.  See Lancon, 253 S.W.3d at 704; Watson,
204 S.W.3d at 414B15, 417.  Rather, the evidence presented at trial was
sufficient to support the verdict, and no contrary evidence exists that would
render the evidence factually insufficient under the applicable standard of
review.  See Lancon, 253 S.W.3d at
704; Watson, 204 S.W.3d at 414B15, 417;
Mendoza v. State, No. 14-95-00704-CR, 1997 WL 367938, at *3 (Tex. App.CHouston
[14th Dist.] July 3, 1997, pet. ref=d) (not
designated for publication) (holding evidence factually sufficient to support
felony offense of injury to child when baby died of traumatic injury to the
head which he suffered while in appellant=s care
even though mother stated that appellant had only spanked baby); see also
Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999) (reasoning
that A[c]ircumstantial
evidence, by itself, may be enough to support the jury=s
verdict@).  Accordingly, we hold that the evidence is
factually sufficient to support Hampton=s
conviction, and we overrule his third point.

V.  Conclusion

Having
overruled Hampton=s second and third points, we
affirm the trial court=s judgment.  See Tex. R. App. P. 47.1.

 

 

SUE WALKER

JUSTICE

 

PANEL: GARDNER, WALKER, and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  February 25, 2010











[1]See Tex. R. App. P. 47.4.





[2]Because the evidence
presented by the State is primarily circumstantial, we provide a detailed
recitation of the facts.





[3]From the record, we
cannot tell what motion Jones was describing.





[4]Dr. Cox testified that it
is hospital protocol for the emergency department to contact the child abuse
evaluation team when there are concerns about a child=s injury. 





[5]After seeing a photo
depicting the abrasion on Jody=s neck, Dr. Cox noted that the abrasion had no
scab, that it appeared to be new, and that it had characteristics similar to
fingernail scratches because there was a peeling of the outer layer of skin.





[6]Dr. Cox could not say
whether the abrasion on the left side of Jody=s forehead occurred with
the severe head injury.  He did not see
any external injuries to suggest the point of impact. 





[7]Dr. Cox could not
quantify how much force it would take to cause this type of injury and said
that he was not comfortable discussing mens rea because he did not know the
intent or motive. 





[8]Dr. Cox was presented
with a paper used by the defense, discussing a study of 363 children who had
been involved in stairway falls; of those in the study, zero went to the ICU
and zero died. 





[9]Dr. Quinton admitted that
he made a mistake in his autopsy report when he used standard language to
describe Jody=s kidneys, which were
absent because they had been harvested prior to the autopsy. 





[10]Dr. Quinton stated that
without the crime scene investigation, he would have ruled the cause of Jody=s death as undetermined. 





[11]Garibay testified that
she also spoke with people at the apartment complex and others but that her
talk with Dr. Cox was more important because he is an expert in child abuse
cases. 





[12]Here, Hampton=s indictment contained
handwritten changes that caused the indictment to read as follows:

 

on or about the 25th day
of May, 2007, . . . did then and there commit or attempt a felony, to-wit:
injury to a Child, and in the course of and in furtherance of the commission or
attempt of said Injury to a Child offense, the defendant committed or attempted
to commit an act clearly dangerous to human life, to wit; by shaking Jody
Hampton, by causing Jody Hampton to strike an unknown object, or by striking
Jody Hampton with an unknown object, that caused the death of Jody Hampton[.] 

 

The
jury charge tracked the indictment language above and instructed the jury to
find Hampton guilty of murder if they believed from the evidence beyond a
reasonable doubt that Hampton committed the acts alleged in the indictment.
Because the jury charge allowed the jury to find that Hampton caused the death
of Jody by shaking or by causing Jody to strike an unknown object or
by striking Jody with an unknown object, the jury was not required to find that
Hampton caused Jody=s death solely by shaking
him.